**POWESHIEK COUNTY NATIONAL BANK,**
Grinnell, Iowa, and John F. Bierman, Executors of the Estate of Ross V. Coutts, Appellees,

v.

**NATIONWIDE MUTUAL INSURANCE COMPANY, Appellant.**

No. 52717.

Supreme Court of Iowa.

Feb. 6, 1968.

Ross H. Sidney, Austin, Grefe & Sidney, Des Moines, Roger W. Sunleaf and McNeil & Bonham, Montezuma, for appellant.

John F. Bierman and C. M. Manly, Grinnell, for appellees.

SNELL, Justice.

This is an action at law to recover on an accident insurance policy issued by defendant. The executors of the estate of Ross V. Coutts, deceased, brought the action as plaintiffs. From judgment following a jury verdict for plaintiffs the defendant has appealed.

Mr. Coutts, a widower about 80 years old, held a membership in National Travel Club through which he held insurance providing certain accidental and death benefits. The insurance provided for medical benefits if the insured sustained a bodily injury caused by accident and a death benefit if the insured sustained a bodily injury caused by accident which resulted directly and independently of all other causes in his death.

On February 4, 1965 Mr. Coutts was a passenger on the cruise ship S. S. Oslofjord, a ship of the Norwegian American Lines, headed for the Mediterranean.

In the early evening he was present at the captain's welcoming cocktail party. There was some hearsay evidence and difference of opinion as to how much, if anything, he had to drink. The matter is of no importance because there is neither claim nor evidence of intoxication. There is evidence that he was not intoxicated.

At about 7:45 p. m. he left the cocktail party in company with several ladies and proceeded down the corridor toward a stairway heading to the deck below where the evening meal was to be served. While standing near the top of the stairs he suddenly and without warning pitched forward, face downward and fell to a landing half way between decks. He made no outcry but grasped the sweater of one of his companions and it went down the stairwell with him. He was a large man. His head struck the bulkhead on the landing. One witness said: "It sounded almost like a watermelon when his head hit the bulkhead

below." The sea was calm and the ship steady. The stair and landing were unoccupied at the time.

Witnesses said he appeared to be unconscious. The ship's doctor and stewards were called.

The doctor's report said: "On the deck was a man lying in an unconscious state. His pulse was normal. He was bleeding from his mouth and had a huge abrasion on the right side of his forehead, but it wasn't bleeding. He was brought to the ship's hospital immediately and put to bed."

The doctor examined him and he was still unconscious. Within 15 minutes he regained consciousness and responded verbally to questions. He remained a patient in the ship's hospital until the ship reached Casablanca. He was under the care of the ship's doctor and nurses. Mr. Coutts' nurse in attendance was referred to as "his sister" in the ship doctor's reports. A daily hospital record showing temperature and medication was kept. In addition thereto the doctor made a written "Report from Ship's Doctor to the Captain," signed at sea about two hours after the accident. He made an additional report signed at sea February 14, 1965, two days after Mr. Coutts left the ship. These reports were written in Norwegian and were identified in this case as plaintiffs' Exhibits 2 and 3. They were translated into English and identified in this record as plaintiffs' Exhibit 7. They were written in narrative form setting forth statistical information and the doctor's observations of the patient. The admissibility of these reports constitute one of the principal fighting points in this case. This problem will be considered infra. This appears as a part of the report of February 14.

"As time went on he was getting better and it was possible to have him out of bed, but he was as helpless as a small child. We could expect him to be in this condition 2 or 3 weeks in the future.

"He needed constant attention and his sister was with him both night and day.

Under these circumstances I decided it would be best for him not to continue on his cruise.

"With all his multiple injuries, I felt it would be wise for him to return home. Something more serious could develop. I made arrangements for him to go home.

"He went by plane from Casablanca on the morning of February 13. He left the ship February 12. He was looked after by the plane's skipper and he went via Paris.

"He was in quite good condition when he left the ship. He still had his bandages on but was up and about and was able to care for himself with a little assistance from the stewardess on the plane.

"A report was sent with him as to what had happened to him and what care he had received. He was going directly to the hospital in his home town.

"Signed: At Sea February 14, 1965.

"Holge Norbye

"Ship's Doctor"

Mr. Coutts returned to Grinnell. He entered St. Francis Hospital on February 14. He remained a patient there until April 10 when he died. Regular hospital records were kept. He was attended by Dr. Brobyn and for short periods when Dr. Brobyn was absent by Dr. Light.

Both Dr. Norbye, the ship's doctor, and Dr. Brobyn, the attending physician in the Grinnell Hospital, died before the trial of this case. Hence, the difficulty in connecting Mr. Coutts' death with his fall.

■ I. One of the objections to the receipt of the ship's doctor's report was that it was written in narrative form. No authority has been cited to us on this point. Such a report might be objectionable because of its contents or other reasons but not because its contents or chronology appear in narrative form. This is illustrated by the Minnesota case, Brown v. Saint Paul City Ry. Co., 241 Minn. 15, 62 N.W.2d 688,

44 A.L.R.2d 535. In that case plaintiff was injured while attempting to board a street car. There was a direct conflict in the evidence as to what happened. The doctor's report contained a narrative report of plaintiff's statement as to how the accident happened. The report was held inadmissible because of the hearsay and self-serving statements contained therein, but the narrative form of the report received no attention. We will refer to the rule as to content of a report in subsequent divisions.

■ II. When properly identified hospital records made by authorized professional personnel (doctors and nurses) are admissible in evidence to show the condition and treatment of the patient. This problem was considered and authorities reviewed in Gearhart v. Des Moines Railway Company, 237 Iowa 213, 21 N.W.2d 569. The statements appearing in Wigmore on Evidence were quoted with approval. There is a circumstantial guarantee of trustworthiness "for the records are made and relied upon in affairs of life and death." loc. cit. 218, 21 N.W.2d loc. cit. 572.

To paraphrase what writers have said, courts should not reject as unreliable information that is accepted and relied upon in matters as important as life itself.

The rule is succinctly stated in Brown v. Saint Paul City Ry. Co., supra, loc. cit. 696 of 62 N.W.2d:

"We believe the better rule is that * * hospital records and charts, properly identified, are admissible when not privileged to prove diagnosis, treatment, or medical history of the patient pertinent to the medical and surgical aspects of the case but that hearsay and self-serving statements contained therein are not admissible to prove how an injury occurred, at least when offered by the patient. Whether they are admissible for impeachment purposes or for some other purpose not here involved we need not now determine."

In the case at bar the records were properly identified and were admissible. The ship's nurse in attendance testified:

"Dr. Norbye attended Mr. Coutts but he is now dead. He was the ship's doctor at the time and he kept some records of Mr. Coutts' condition, I saw him write it. They were kept in the ship's hospital. He typed his reports and put them in the archives in the hospital. He signed the reports and I saw him sign reports as to Mr. Coutts. Dr. Norbye is in charge of these records. (Plaintiff's Exhibits 2 and 3 were marked for identification) Exhibit 2 is the doctor's record about Mr. Coutts' time in the hospital on board and Exhibit 3 is the record that the doctor wrote after he went home, that is a record for his time on board, I mean a summary. Exhibit 3 is the summary. These exhibits were typed by Dr. Norbye and signed in my presence. Dr. Norbye did not keep any other records as to Mr. Coutts' condition. At the time Mr. Coutts became hospitalized, the ship was in the South Atlantic and we were going to Casablanca to the Mediterranean Coast. I think we were four days out of New York. Mr. Coutts left the Oslofjord at Casablanca. Exhibits 2 and 3 are written in Norwegian. Exhibit 1 is for all the time that Mr. Coutts stayed on board ship. Exhibit 2 covers Mr. Coutts' condition while on board ship. Exhibit 3 is a summary of Mr. Coutts' injury while on board ship."

The statement that "Exhibit 3 is the record that the doctor wrote after he went home * * *" obviously refers to the time Mr. Coutts went home. Mr. Coutts left the ship February 12 at Casablanca. Exhibit 3 was dated "At Sea February 14, 1965."

■ In the Gearhart case, supra, loc. cit. 218, 21 N.W.2d 569, we rejected the suggestion that hospital records were admissible under the statute relating to books of account (section 622.28). However, we think Dr. Norbye's "reports" identified by the nurse as his records, timely made, signed

and kept in the hospital archives, were within the provisions of section 622.27, Code of Iowa. This statute provides:

"Entries and writings of deceased person. *The entries and other writings of a person deceased, who was in a position to know the facts therein stated, made at or near the time of the transaction, are presumptive evidence of such facts,* when the entry was made against the interest of the person so making it, or *when made in a professional capacity or in the ordinary course of professional conduct,* or when made in the performance of a duty specially enjoined by law." Emphasis added.

We considered this statute in Kennedy v. Oleson, 251 Iowa 418, 100 N.W.2d 894. A survey had been made by a professional land surveyor. He was deceased at the time of trial. His notes had been made at the time and incident to his survey. They were part of his permanent records. They were in his own handwriting. We said:

"Clearly the writings come within section 622.27 and we hold they are admissible in evidence under such section. They are presumptive evidence subject to contradiction by any proper method." (loc. cit. 423, 100 N.W.2d loc. cit. 897)

In the case at bar the reports were typed by and signed by the doctor. The facts are comparable to the cited case. We hold that Dr. Norbye's reports were admissible in evidence under section 622.27.

■ Assuming, as we have held, that doctors and hospital records may be admitted as exceptions to the hearsay rule, they may not be used to establish disputed issues not germane to physical condition or medical treatment. See authorities cited in Division I. For example: A doctor might testify or put in his record that his patient told him that he was hit by a car while crossing the street but the doctor may not testify as to charges of negligence made by his patient against the driver of the car. Conversely the inclusion of nonprejudicial hearsay may not be of such consequence as to prevent admission. The old maxim "De minimis non curat lex" might apply.

Dr. Norbye's report was admissible. He was the attending physician and had the special knowledge permitting him to voice "his true state of mind on the matter, whether it be possibility, probability, or actuality." Grismore v. Consolidated Products Co., 232 Iowa 328, 348, 5 N.W.2d 646, 657.

We find no reversible error in the admission of the ship's hospital records and Dr. Norbye's reports.

III. Mr. Coutts entered the Grinnell Hospital on February 14 and was a patient there until he died on April 10. Medical history was noted, and complete records and progress reports were kept. These reports, including the death certificate, were signed by Dr. Brobyn, the attending physician. Dr. Brobyn was dead at the time of trial. His notes were read and studied by other medical witnesses. Certain parts were rather hard to decipher.

"Q. What was the reason for this? A. Medical illegibility.

"Q. Handwriting in other words? A. Yes."

The doctors, however, found them sufficient for the purpose.

The admissibility of the Grinnell Hospital records has not been questioned.

Based on what plaintiffs claim was shown by admissible evidence including the records of the ship's doctor and the Grinnell Hospital records long and detailed hypothetical questions were asked and answered by three medical witnesses. Each was highly qualified to testify. Dr. Light, a general practitioner, was chief of staff in the Grinnell Hospital and had been called to take care of Mr. Coutts for four days while Dr. Brobyn was away. Dr. From was a certified specialist and a diplomate of the Board of Internal Medicine. Dr. Bakody was a certified specialist and a diplomate of the American Board of Neurological Surgery. Each

witness had, prior to testifying, studied the records in detail and at length and gave the reasons for his conclusion. Comprehensive objections were made by defendant to each hypothetical question and were overruled. Assuming the validity of the information provided in the hypothetical question and applying it to an analysis of these facts, the doctors' own knowledge and experience in caring for patients, opinions were expressed and answers given. The substance of the answers was that Mr. Coutts did not have a stroke at the time of his fall; that if he had not had the accident he would have been alive at the time of the trial and would not have died when he did; that there was a cause and effect relationship between the accident and death and that "within the realm of reasonable medical certainty, it is my opinion that this man could not be reasonably assumed to have died on the date of 4-10-65 were it not for the accident of 2-4-65."

If the questions were proper the testimony was sufficient to generate a jury question as to cause of death.

The certificate of death signed by Dr. Brobyn listed immediate cause of death as "cerebral arthiosclerosis with thrombosis." The spaces on the death certificate calling for "conditions, if any, which gave rise to above cause" or "underlying cause" were blank. There was nothing in the death certificate attributing death to accidental means. The doctors who testified reconciled this record with their conclusions so as to present a jury question.

■ IV. In Ipsen v. Ruess, 239 Iowa 1376, 1388, 35 N.W.2d 82, 91, we said: "It is firmly established that an expert witness may not base an opinion in whole or in part upon opinions of others, whether lay or expert, even though such opinions appear in evidence."

We recently considered the question of foundation for opinion testimony based on hearsay, i. e. multiple hearsay in Dougherty v. Boyken, Iowa, 155 N.W.2d 488, filed January 9, 1968. In that case we rejected the foundation for the opinion of an eminently qualified expert. He based his opinion in part on what a member of the highway patrol told him in a conversation as to "what the results of his investigation were" and also on demonstrably unreliable and inadequate information. The matters related to the vital issue in the case. We said:

"Before it can evaluate an expert's opinion, the jury must know what it is founded on. This may be done by having the witness state what facts he relies on and their source or by having facts assumed to be true by way of hypothetical question. Neither was done here. Rather the witness stated he had obtained from Sergeant Angle in an out-of-court discussion the results of an investigation carried on by the officer. He did not say what those results were."

In the case before us we have a different situation. The experts here were not basing their opinions on other opinions relating to a vital issue. They were basing their opinions on information, as distinguished from opinions, drawn from information contained in reports that we have said, supra, were admissible. The opinions here proceeded from a different foundation and were not vulnerable to the same objection as in the Dougherty and Ipsen cases, supra.

The hypothetical questions were not based on any hearsay contained in Dr. Norbye's report. Some of the immaterial information that would appear to be hearsay in Dr. Norbye's report also appears in the Grinnell Hospital report to which no objection appears.

■ V. Facts stated in a hypothetical question must have support in the evidence but the question need not contain all the facts shown by the evidence. Litigants are "entitled to frame the question according to their theory of the case, as their construction of the evidence showed the facts to be or as the jury would have a right to find them." In re Estate of Telsrow, 237 Iowa 672, 682, 22 N.W.2d 792, 798, and Boe-

gel v. Morse, 251 Iowa 1253, 1257, 104 N.W. 2d 826.

VI. Appellant particularizes wherein it is claimed the hypothetical questions were without support in the record. We will consider them in order.

Defendant objected to the assumption "that on December 23, 1964, an EKG was taken and found essentially normal." Included in the hospital records received in evidence were 7 EKG reports taken for Dr. Brobyn by cardiologists and covering a period from October 18, 1962 to March 8, 1965. The December 23, 1964 report said "Essentially normal EKG without significant change since 1/3/64." The January 3, 1964 report to which reference was made said "Essentially normal EKG."

The objection was without merit.

Defendant complains because of the assumption "that he was a well developed white male who was apparently in good health." This complaint is directed at a small part of the question and is lifted out of contest. The assumption in the part objected to was as follows:

"Now, Dr. From, I ask you to assume that the deceased is a man of 80 years old with some known arteriosclerosis, having previously sustained a coronary infarction in October 1962 and with it had phlebitis of the right leg that took a month or more to heal. To assume further that on December 23, 1964, an EKG was taken and found essentially normal. That he had previously been treated for prostate trouble and had had a stricture of the urethra. That he previously had a fracture of the right clavicle and an appendectomy. That you are to further assume that he was a well developed white male who was apparently in good health and was on a cruise in the Atlantic Ocean aboard the M/S Oslofjord."

With such a full disclosure of Mr. Coutts' past medical history the reference to apparent good health was in no way misleading.

While we might assume that reference to "good health" in a man 80 years old with previous ailments was a relative term and did not imply the vigor of youth there was plenty of evidence to support the assumption.

Four witnesses testified as to their observations. Two testified that they observed nothing wrong and two said he "was in perfect shape to start, * * * perfectly all right," or "he looked real well."

There was nothing in the History and Physical Examination report contained in the Grinnell Hospital records to refute the assumption. Under "past illnesses" there was nothing within two years. We find no error in this assumption.

It was well within plaintiffs' "theory of the case as their construction of the evidence showed the facts to be."

Defendant objects to the words "while in conversation with other individuals." The record shows a clear basis for the assumption. Mr. Coutts and several ladies had been together in the cocktail lounge. They proceeded down the corridor toward the stairway to the deck below. Mrs. Lovell, one of the ladies, testified:

"We stopped at the head of the stairs. The reason for the stop there as I remember it was I was waiting for Mrs. Foster to catch up. Mr. Coutts and Mrs. Spaulding had stopped to talk over whether they wanted to go to dinner or whether they did not. There were hors d'oeuvres and things like that and we were talking about what we were going to do next. * * *"

The hypothetical question assumed "that this man had at least a cerebral concussion from the fall." Adequate support is found in the record. Dr. Norbye's report written a few hours after Mr. Coutts' admission to the ship's hospital contained the following notations:

"He is suffering from a severe blow to his head, which he undoubtedly received from his fall down a flight of steps at

19:45 today. I cannot say at this time if his skull is fractured, until X-rays are taken.

"He is on complete bedrest in the ship's hospital and precautions are being taken for possible skull fracture.

"He acts like a man that is drunk, but this is often a symptom of a concussion or skull fracture.

"His present condition isn't very good, but we have to take into consideration that he is a man of 87 and has had considerable trauma to his head and body."

(Mr. Coutts was actually 80 and not 87)

The Grinnell Hospital record shows admission diagnosis in Dr. Brobyn's handwriting "Fracture of ribs, moderate concussion."

The hypothetical question said: "That an EKG was taken on March 8, 1965 and found essentially normal with no significant change since December 23, 1964."

As noted, supra, the hospital records included EKG reports. These appear in folders containing the cardiologist's report and mounted electrocardiogram tracings.

The fact assumed in the question was supported by the record.

Defendant complains that the hypothetical question was misleading in that it involves both an inclusion and an exclusion. The complaint is hypercritical.

■ We have noted, supra, and appellant concedes that such a question need not contain all the facts. It must, of course, contain sufficient of the facts to give some weight or credibility to the opinion expressed. Counsel in preparing a hypothetical question naturally paints as favorable word picture as his evidence permits. The hypothetical questions here were within permissible limits. We find neither improper inclusions nor such exclusions as to so destroy their weight and credibility as a jury question.

■ VII. Defendant's motions for directed verdict and notwithstanding the verdict were properly overruled. Plaintiffs had the burden of proving their case by a preponderance of the evidence, but were entitled to a view in the light most favorable. If supported by substantial evidence the jury's findings of fact are binding on us. Citation of authority is unnecessary. Rule 344(f)1, 2, 5 and 6, Rules of Civil Procedure.

It is not for us to pass on the weight and credit of the evidence. That is what juries are for.

As we have indicated in Division III, supra, there was a jury question.

■ In a case such as this it is not necessary that there be evidence of absolute certainty as to cause of death. Evidence as to "reasonable medical certainty" is sufficient.

It should be kept in mind that the question was not what caused Mr. Coutts to fall. The question was what caused his death.

We will refer to this proposition in the next division.

VIII. Instruction #4 as given by the trial court required plaintiffs to establish by a preponderance of the evidence two propositions:

"1. That plaintiffs' decedent sustained an accidental fall on February 4, 1965 and;

"2. That said accidental fall caused bodily injuries which resulted directly and independently of all other causes, in his death on April 10, 1965."

Instruction #6 which is attacked by defendant was as follows:

"You have previously been instructed that one of the propositions that plaintiff has to establish by a preponderance of the evidence is that plaintiff's decedent had an accident.

"You are instructed that the term accident as used in said policy is to be given its ordinary, usual, and popular meaning. Basically accident means happening by chance, unexpectedly, taking place not according to the usual course of things or not as expected.

"If, after a careful consideration of all the evidence you find that the plaintiff has not established that the plaintiffs' decedent sustained an accidental fall on February 4, 1965, then in such an event it being a material allegation of the plaintiffs' petition, you should find for the defendant.

"If, however, after a careful consideration of all the evidence you find that the plaintiffs' decedent did sustain an accidental fall on February 4, 1965, then in such an event the first material allegation of the plaintiffs' petition will be established and then you will proceed to determine the second material allegation of the plaintiffs' petition that the said accidental fall caused bodily injuries which resulted directly and independently of all other causes in his death on April 10, 1965."

Defendant's requested instruction #2 (not given by the court) included considerable elaboration on what is an accident and the following statement:

"It appears without dispute in this case that the plaintiffs' decedent was suffering from an advanced disease known as 'arteriosclerosis' or, in laymen's terms, 'hardening of the arteries' and that said disease was diagnosed some two years prior to February 4, 1965 and that plaintiffs' decedent had knowledge of said disease. Thus, if you find that the fall of plaintiffs' decedent was the result of some symptom or manifestation of that disease which rendered him unconscious resulting in a fall, then the fall would not be accidental and you should so find."

Defendant tacitly admits that the definition of the word "accident" in the court's instruction was correct but argues that the instruction as given should have pointed out preexisting diseases and physical conditions resulting in the fall.

■ The trial court was alerted to defendant's claim and error may appear from failure to adequately instruct. Oltmanns v. Driver, 252 Iowa 1066, 1070, 109 N.W.2d 446.

Many definitions of the word "accident" appear in Feder v. Iowa State Traveling Men's Association, 107 Iowa 538, 78 N.W. 252, cited by appellant. They are not in conflict with the definition used here.

In the cited case decedent "was suffering from consumption." He reached to close some window shutters and "as he did so, blood began to flow from his mouth. He was placed on a lounge, and died within a few minutes." Death was caused by hemorrhage from a ruptured artery and there was evidence that the rupture was not due to the disease from which he was suffering. There was no evidence that he fell, slipped or lost his balance. He just suffered a hemorrhage and died.

In the case before us decedent fell, struck his head in the fall, was unconscious and doctors attributed his subsequent death to his fall.

Appellant cites, relies upon and quotes from Meyer v. Fidelity and Casualty Co., 96 Iowa 378, 65 N.W. 328. We do not think this case gives to appellant the comfort claimed for it. The facts in that case are interesting in relation to the case before us.

Decedent was insured under an accident insurance policy. The policy provided "that the insurance should not cover 'injuries, fatal or otherwise, * * * resulting directly or indirectly from intoxicants, anaesthetics, narcotics, sunstroke, freezing, vertigo, sleepwalking, fits, hernia, or any disease or bodily infirmity.'" (loc. cit. 379, 65 N. W. loc. cit. 328)

He was in good health, temperate and industrious. While on the street he was seen

close to an electric light pole with his right arm about the pole. His left hand was raised. His body had a wavering or staggering motion. He fell and his head struck the pavement resulting in a skull fracture and subsequent death.

The insurance carrier denied liability claiming death was not due to an accident but to one of the conditions excluded from coverage. The jury was instructed that if death was due to an attack of vertigo or fits plaintiff could not recover. This was followed by explanatory instructions as to what would be "disease" within the exclusionary provisions of the policy.

In the opinion affirming judgment for plaintiff this appears:

"The language used is made up of words framed by the company or its legal advisers in an attempt to limit as narrowly as possible the scope of the insurance; and it is a universal, as well as a fair, rule, adopted by the courts everywhere, to construe the terms of the policy most strongly against the assurer, and to resolve every doubt or ambiguity in favor of the assured and against the assurer. * * *" (loc. cit. 385, 65 N.W. loc. cit. 330)

"It is also said in argument that the policy covers death from violent, external, and accidental means, and that the proximate cause of death in this case was not the fall, but some disorder with which the deceased was afflicted. It is quite clear, both on principle and authority, that, if the disorder which caused the fall was temporary and unexpected, the injury was violent, external, and accidental, and the whole matter was properly left to the jury for them to determine whether the disorder was of a temporary character." (loc. cit. 387, 65 N.W. loc. cit. 330)

In the case before us it was not necessary for the court to analyze the evidence supporting divergent theories of the case. The evidence was all before the jury. "Accident" was defined. The issue was, did decedent have an accident "resulting directly and independently of all other causes" in his death? This was in accord with the insurance policy which provided:

" * * * indemnity for loss of life, limbs or sight and other specified losses resulting directly and independently of all other causes from injury sustained by any Insured Member.

" 'Injury' as used in this Policy means bodily injury caused by accident occurring anywhere in the world while this Policy is in force with respect to the Insured Member whose injury is the basis of claim and sustained by the Insured Member."

The only exclusions mentioned in the policy were suicide and war. There were no specific exclusions in the policy covering disease that constituted the issue in the Meyer case.

We think the instructions as given in the case at bar were adequate.

IX. This was a case difficult for plaintiffs to prove. The insured was dead. The two doctors under whose care he was treated were dead. Other witnesses were scattered. The case was defended with professional skill and vigor. Nothing was overlooked.

Death comes to old men from different and multiple causes constituting a syndrome. There is difficulty in pinpointing a specific cause of death. Here there was expert opinion testimony within the limits of "reasonable medical certainty." We think it was sufficient to generate a jury question.

We find no reversible error.

The case is

Affirmed.

All Justices concur.