**Francis Vern KELLOGG, Appellant,**

v.

**STATE of Iowa, Appellee.**

**No. 63360.**

Supreme Court of Iowa.

Feb. 20, 1980.

Lloyd E. Humphreys, of Humphreys & Associates, Cedar Rapids, for appellant.

Thomas J. Miller, Atty. Gen., Lona Hansen, Asst. Atty. Gen., and David H. Correll, Black Hawk County Atty., for appellee.

Considered by REYNOLDSON, C. J., and REES, HARRIS, McGIVERIN and LARSON, JJ.

HARRIS, Justice.

In *State v. Kellogg*, 263 N.W.2d 539, 544 (Iowa 1978), we affirmed this petitioner's conviction of second-degree murder. § 690.3, The Code 1975. For want of an adequate record, however, we reserved for a possible postconviction proceeding any consideration of Kellogg's assertion he was denied effective counsel. Kellogg accepted our invitation and brought this postconviction proceeding under chapter 663A, The Code 1979. He now appeals the trial court's denial of his claim. We affirm the trial court.

■ I. The burden of proof is upon the postconviction petitioner to establish by a preponderance of evidence a claim of ineffective assistance of counsel. The question is whether, under all the circumstances, the attorney's challenged performance was within the range of normal competency. *State v. Veverka*, 271 N.W.2d 744, 750 (Iowa 1978), and authorities. In general our review of postconviction rulings under section 663A.9 is on error and not de novo. But there are broad exceptions.

■ We have often said that where, as here, there is an asserted violation of a basic constitutional safeguard we make our own evaluation of the totality of circumstances under which the ruling was made. *E. g.*, *Stanford v. Iowa State Reformatory*, 279 N.W.2d 28, 31 (Iowa 1979). Whether we call such a review de novo or a review under the totality of circumstances our function is the same. We consider anew all the matters presented to, and which should have been considered by, the trial court and reach our own conclusion on whether the constitutional safeguard was violated. It makes no practical difference whether such a review is called de novo or one under the totality of circumstances. *State v. Boren*, 224 N.W.2d 14, 15 (Iowa 1974), cert. denied, 422 U.S. 1008, 95 S.Ct. 2630, 45 L.Ed.2d 671 (1975).

■ II. Kellogg comes perilously close to ineffectively presenting his claim of ineffective counsel. The postconviction court took judicial notice of the "court file." And Kellogg raised in the postconviction proceeding the same arguments of ineffective counsel that he attempted in his first appeal. But it is far from clear that the original appellate briefs were ever made a part of this proceeding. Hence, the inclusion of those briefs in the appendix on this appeal may not be proper.

Kellogg may have feared that the original briefs had not become a part of the record. Perhaps for this reason he stated in his appellate brief on this appeal that they were "incorporated by reference." We know of no authority for such a step. It seems contrary at least to the spirit of Iowa R.App.P. 10(a) and 14(a)(5). Nevertheless, without suggesting we must, we choose to pass any procedural failures and proceed with our de novo review on the merits.

This proceeding necessarily became a trial of the professional conduct of James C. Dunbar who was Kellogg's original trial counsel. In several ways his conduct in the preparation and trial of the murder case was severely criticized. Dunbar answered these criticisms in his testimony in this proceeding. We shall weigh the criticisms together with Dunbar's explanations in the divisions that follow.

■ III. Kellogg first points to the fact that Dunbar did not take pretrial discovery depositions. Kellogg now claims that failure to take discovery depositions indicates that Dunbar's representation was ineffective. But Dunbar is not persuaded that discovery depositions are always good tactics for a criminal trial. He testified he informally interviewed witnesses and potential witnesses rather than deposing them. With one exception he interviewed all witnesses who were later called by the State. One witness (Bransteater) was not interviewed because he would not keep appointments. Dunbar did not interview all witnesses listed on the State's minutes for additional testimony but testified he was not surprised by any of the trial testimony. Dunbar stated he heard no testimony at trial he did not anticipate.

Dunbar's reservations about taking discovery depositions in criminal cases have to do with his belief that the technique is a "two-edged sword." He believes they help the State as much as the defendant, that the procedure is as informative to the prosecutor as to the defense counsel, and also alerts witnesses to questions that would be asked at trial.

We recognize the use of discovery depositions can be a valuable tool in the preparation of criminal trials. We cannot say, however, that it is an absolute requirement for preparation. Neither can we say that Dunbar's strategic decision not to depose the potential witnesses is an indication of incompetent representation.

■ Kellogg raises a similar charge against Dunbar's failure to file any pretrial discovery motions. Dunbar explained that they were unnecessary in this case because the county attorney made his complete files available to him prior to trial. He viewed all evidence the State then had in its possession. He was again given the State's files the weekend before trial and once more thoroughly examined them. He felt there was nothing more for him to discover. Under these circumstances we cannot say that the failure to file pretrial discovery motions reflect adversely upon Dunbar's professional competence.

■ IV. Kellogg also argues that Dunbar's incompetence is shown by his failure to consult and call various expert witnesses. It is first suggested that experts should have been consulted in the field of weapons. Kellogg suggests that the question whether the murder weapon had a "hair trigger" was crucial to his defense theory that the death was accidental. But we agree with Dunbar that the question whether the gun had a "hair trigger" was not central to his theory of the case. The evidential dispute was whether Kellogg or his wife was holding the gun when it discharged while it was pressed against her head. The question was not how easily the gun fired but rather who was holding it at the time.

Kellogg also claims that Dunbar should have consulted with experts about particles of blood, bone, and skin which were found inside the gun barrel after the killing. There was testimony at trial that they would have been found if the barrel were in fact pressed against the victim's head. This conclusion was not in any way damaging to Kellogg because it was entirely consistent with his testimony that the victim held the gun to her head and shot herself.

Kellogg also complains because Dunbar did not consult or call an accident reconstruction expert. But again, there was nothing inconsistent between the State's testimony and Kellogg's account of the victim's position when she was shot. The State's witness testified that flecks of blood on the headboard of the bed indicated the victim's head was very close to the headboard when the gun discharged. This was entirely consistent with Kellogg's account. The same can be said with regard to Kellogg's complaint that Dunbar should have consulted a fingerprint expert. No fingerprints were found on the murder weapon. There would be no point in Kellogg calling a fingerprint expert to testify about fingerprints on the murder weapon. Any fingerprints found elsewhere were consistent with Kellogg's account of how he and his wife handled the two weapons on the day of the murder.

Kellogg shows no injury from Dunbar's decision not to consult the expert witnesses or use them at trial. He has failed to carry his burden of proving Dunbar was incompetent or in any way ineffective on this contention.

■ V. Kellogg next complains of Dunbar's failure to introduce evidence of the victim's allegedly violent temper. According to Dunbar's investigation, however, it appeared that any violence or assaults by the victim were provoked by Kellogg himself. Dunbar chose not to use the evidence of the victim's conduct for fear it would open the door to further showing of the past stormy relationship between Kellogg and his wife. We conclude, especially in view of our holding in Kellogg's first ap-

peal, that this was a sound tactical decision by Dunbar. We held that prior relations between Kellogg and his wife were admissible to show Kellogg's malice. *Kellogg*, 263 N.W.2d at 542. Dunbar's decision in this matter was certainly no indication of incompetence.

■ VI. · Kellogg would also characterize Dunbar as incompetent for his failure to move to suppress evidence found at his house and to suppress statements he made to police after the murder. We have held that a strategic decision not to file a suppression motion is not necessarily an indication of ineffective assistance of counsel. *State v. Cooper*, 161 N.W.2d 728, 730 (Iowa 1968).

A number of things were seized from Kellogg's home, including the murder weapon and a shotgun. Dunbar testified he considered moving to suppress this evidence but did not do so because he thought the motion would not prevail. The victim's mother, who was also living in the house, consented to the search. Dunbar, as we have said, settled on a defense theory that the shooting was suicide or accidental. In this connection he believed it would be advantageous to have the weapons in evidence because it would show that the gun was not brought into the bedroom for purposes of murder. Rather, Kellogg wanted it shown that he kept guns around the house as a matter of habit.

Kellogg believes statements he made to police might have been suppressed on the basis of his intoxication. Dunbar looked into the matter and concluded such a motion could not prevail because he did not feel that he could show Kellogg was intoxicated when he made the statements. Kellogg denied being intoxicated in spite of his blood alcohol level which was shown to be 0.215. Dunbar interviewed several witnesses who observed Kellogg at the time and no one remembered him as intoxicated. Similarly, notwithstanding the victim's emergency room record showing that Kellogg was hysterical, Dunbar was unable to find a witness who would so testify. Kellogg argues that the record itself was admissible as a hospital record. We are a good deal less sure. The record was the victim's and not Kellogg's. *See In re Estate of Poulos*, 229 N.W.2d 721, 727 (Iowa 1975); *Poweshiek County Bk. v. Nationwide etc. Co.*, 261 Iowa 844, 851, 156 N.W.2d 671, 675 (1968). In any event Dunbar did get the State to stipulate the medical report in evidence. He was not shown to be incompetent in failing to move to suppress it.

VII. Finally, Kellogg claims that Dunbar was ineffective for failing to present what Kellogg believes was exculpatory evidence. This claim points to Dunbar's refusal to call two witnesses and to offer a claimed suicide note.

■ The witnesses were the petitioner's daughter and the victim's mother who were both in the house at the time of the murder. The daughter was listed on the minutes of testimony for the State but was not called at trial. When Dunbar interviewed her it appeared that she would testify that a few minutes before the shooting she saw Kellogg holding his wife's arm and leg down upon the bed. Kellogg now claims the daughter would have testified that the victim directed her to leave the room. Under the circumstances we agree with Dunbar that the victim's direction that her daughter leave the room would not be helpful and the daughter's other testimony would have been devastating.

■ Dunbar also interviewed the victim's mother and learned that she was so hard-of-hearing she scarcely heard the discharge of the gun. She could tell there had been conversation in the bedroom but could not repeat any of it. The mother was called as a state witness at trial and testified she heard the conversation only as "muffled sounds." She described the shot variously as a "noise" and a "bang." At trial Dunbar was able to show the victim's mother told police she heard Kellogg say, "Don't do it," just prior to hearing the shot. We are unable to criticize Dunbar's decision in not calling either of these women as a witness.

Kellogg criticizes Dunbar's failure to introduce into evidence what he now calls a suicide note written by the victim. Dunbar interviewed the victim's mother and a close friend about the note and concluded it was written in 1971 or 1972. At that time the victim was under the impression she had cancer. Dunbar believes the note portrayed Kellogg's character in a damaging light and decided Kellogg would be more damaged than aided by the note. He discussed the problem with Kellogg and recommended against offering it. This does not seem unwise, especially in view of the testimony of other witnesses that the victim was happy and was planning for the future on the day of the murder.

VIII. The right of anyone accused of crime to the effective assistance of counsel is as precious as it is fundamental. A fair trial requires the efforts of competent attorneys to present both the prosecution and the defense. Iowa boasts a long tradition of recognizing this truth. *See* §§ 2852 and 2853, The Code 1851. We have always provided counsel to indigents at public expense. § 2561, The Code 1851. It is certainly no affront to this truth to point out, as we have many times, that a criminal conviction is not tantamount to an ineffective counsel. The review of professional performance is to be made, not with 20/20 hindsight, but in the light of the press of trial and trial preparation. Our adversary system would indeed be threatened if we reached the point where defense counsel were to assume a conviction would automatically be followed by a claim of incompetence.

We have nothing more in the record here. On our de novo review we find the performance of Kellogg's trial counsel fell easily within the range of normal competence. We do not believe the question is at all close.

IX. In another assignment Kellogg challenges on equal protections grounds our procedure which required him to present his claim of ineffective counsel in a postconviction proceeding. As authority he cites U.S.Const. art. IV, § 2 and amend.

XIV, § 1, and Iowa Const. art. I, § 10. He believes we should have considered his assertion of ineffective counsel upon his first appeal without benefit of Dunbar's explanations.

Kellogg, as we have said, bears the burden of proof to show ineffective counsel. The fact of this burden places him in an odd position to complain of our procedure which provides for a thorough presentation of the professional efforts he seeks to establish as ineffective. We have held that counsel has a right to explain his professional efforts. *State v. Coil*, 264 N.W.2d 293, 296 (Iowa 1978). We have also held that the State has such an opportunity. *Kellogg*, 263 N.W.2d at 544. These rights provide ample classification grounds to justify a more elaborate procedure when there is an assertion of ineffective counsel. Kellogg's constitutional challenge to our procedure for testing effectiveness of counsel is without merit.

AFFIRMED.