THOMAS H. VAN SICKLE, Administrator, Appellant, v. M. E. DOOLITTLE, Appellee.

EVIDENCE: Opinion Evidence—Disease Suffered by Patient—Competency of Witness—Malpractice. In an action for malpractice by a physician of the homeopathic school of medicine, a physician of the allopathic school may, on proper foundation, very properly give his opinion as to what disease the patient was probably suffering from, even though he knows nothing of the homeopathic manner or method of diagnosing or treating disease, the record showing that the science of pathology is common to both schools. (See Sec. 2576, Code, 1897.)

PHYSICIANS AND SURGEONS: Malpractice—Negligence—Evidence—Jury Question. Evidence reviewed, and *held* sufficient to carry to the jury the question whether, in an action for malpractice, the defendant was negligent (a) in failing to see the patient with such frequency as the case demanded, (b) in failing to give proper medicine and skilful treatment and (c) in failing and refusing to do anything for the relief and cure of the patient when it was apparent that her condition was dangerous.

*Appeal from Sioux District Court.*—W. D. BOIES, Judge.

MONDAY, JANUARY 24, 1916.

ACTION for damages consequent on alleged malpractice

resulted in a directed verdict for defendant and judgment thereon. The plaintiff appeals.—*Reversed.*

*Shull, Gill, Sammis & Stillwill,* and *C. A. Plank,* for appellant.

*Snell & Randall* and *W. E. Johnston,* for appellee.

LADD, J.—The plaintiff brought this action as administrator of the estate of his deceased daughter, Marjorie Van Sickle, who died at the age of nine years and some months, Wednesday, Sept. 20, 1911. She appears to have been in good health until the Saturday previous, and then complained only of a headache. On Sunday, as she had not recovered, the defendant, a physician of the homeopathic school of medicine, was called, and treated her until Wednesday afternoon, when she died. The allegations of the petition are that defendant failed to exercise ordinary care and skill in endeavoring to cure the child of her ailment, in that he "neglected to see her with such frequency as the case demanded; by neglecting to give her proper medicine and skillful treatment; by neglecting and refusing to do anything for her relief and cure when it became apparent that she was in a dangerous and precarious condition; and by unskillfully and negligently administering to her certain medicine, the ingredients of which are not fully understood and known to this plaintiff, but which was injurious to her at the time of its administration, and which the defendant, if he had used proper care and skill, ought not to have administered to said child in the circumstances at said time existing". The answer was a denial of the above allegations. The only errors assigned are: (1) Sustaining defendant's motion to instruct the jury to return a verdict for defendant; and (2) sustaining defendant's objections to the questions propounded to the witness Fettis. The last point may first be disposed of.

I. J. M. Fettis, qualified as a physician of the regular or allopathic school, testified that he knew nothing of the

homeopathic method of treatment of diseases as to manner of
diagnosis or method of treatment. The condi-

1. EVIDENCE:
opinion evi-
dence: dis-
ease suffered
by patient:
competency of
witness:
malpractice.

tions and symptoms of the girl from Saturday
until the time of her death, as shown by the
evidence, including the treatment given her
by the defendant, were recited, and the
doctor was asked: "What, in your opinion, as indicated by
the symptoms revealed in the question, was the child probably
suffering from?" An objection, with others, that the witness
was incompetent, for that he belonged to a different school
of medicine than defendant, was sustained. All reference to
medicines administered was withdrawn and the question re-
newed, and the same objection sustained. These objections
ought to have been overruled. Though, according to the evi-
dence, the homeopathist is controlled by symptoms, in deter-
mining upon and prescribing treatment, and might not be
negligent even though he did so without ascertaining the
particular malady of the patient, this does not preclude inquiry
as to the disease or diseases with which she may have been
afflicted, and then inquiring of a homeopathist what would
have been the appropriate remedy therefor, and in this man-
ner proving that improper treatment was given. That the
witness belonged to a different school of medicine did not
disqualify him from expressing an opinion as to what ailed
the patient. Methods of diagnosis do not differ in the differ-
ent schools, and this appeared from the subsequent examina-
tion of the witness. Moreover, Sec. 2576 of the Code, in
providing for the issuance of licenses to practice medicine,
exacts that each candidate for examination in any school of
medicine shall be given the same set of questions "covering
anatomy, physiology, general chemistry, pathology, surgery
and obstetrics", and these subjects are taught by the same
teachers to students of the several recognized schools of
medicine. In *materia medica,* therapeutics and the principles
and practice of medicine, a set of questions is used corre-
sponding to the school of medicine which the applicant de-

sires to practice. As to these latter subjects, the competency of the witness was not shown; for medicines and methods of using them differ somewhat in different schools. But the science of pathology is common to both schools, with nothing peculiar to either; and therefore, the witness should have been allowed to answer.

II. There was no evidence in the record that the defendant administered medicine either of strength or kind which actually injured the child. If he is to be held liable, it must be on one or all the other grounds;

2. PHYSICIANS AND SURGEONS: malpractice: negligence: evidence: jury question.

that is, that he neglected to give her proper medicine and treatment, failed to administer anything for her relief and cure, although she was in a precarious condition, and neglected attending to her with ordinary diligence when sick. That he held himself out as a physician qualified to treat diseases according to the homeopathic school of medicine, and engaged to treat Marjorie Van Sickle, is not questioned. In so doing, he was bound to exercise the degree of care and skill, according to his system, ordinarily possessed by physicians practicing in similar localities. *Bowman v. Woods*, 1 G. Greene 441; *Ferrell v. Ellis*, 129 Iowa 614. Bearing in mind not only that the evidence must have tended to prove negligence in one of the respects charged, but that the patient must have been injured in some manner thereby, in order to carry the case to the jury, let us turn to the evidence. It is somewhat peculiar; and, in order to ascertain whether a prima-facie case was made out, it will be necessary to set out the evidence in detail.

Mrs. Van Sickle, the mother of decedent, testified that the child had never had any serious sickness before; that she complained of a headache Saturday, was given castor oil, which caused her bowels to move the next morning, when, as her headache continued, she was given a bath and put to bed; and that her husband went for the doctor after 12 o'clock M., and he arrived at 2 o'clock P. M.

"He asked me what I thought of little Marjorie, and I told him I thought she was bilious, and he said that there wasn't such a thing, and if there was, it was hereditary; and then he fixed up two little vials of medicine. He didn't do anything with reference to examining the child or asking her questions. I took the thermometer and took her temperature, and it was 102. She was dressed and lying on the couch in the front room. He didn't go to her and make an examination. He sat on the couch and kind of toyed with her, I thought, and talked a little bit, but I don't remember what he said. I don't think he was there more than half an hour, and when he left he said she was not very sick, and that she would be up in the morning. He left two vials of medicine with instructions that they were to be given five and seven drops every hour that afternoon. The vials that he left are marked Exhibits 'A' and 'B'. Dr. Doolittle put the writing on the stickers that appear on these bottles. He filled them with medicine himself and got it out of his suit case right there in the room. He said to give 5 to 7 drops out of the large bottle for the fever, and he fixed the first dose and I gave it to her, and I gave her a dose after that every hour until about 8 or 9 o'clock. She fell asleep about 8 o'clock, and I didn't give her the medicine that she should have had at 9 o'clock. I think he said to give her 5 to 7 drops out of the smaller vial on Monday morning, for the nerves."

She gave her two such doses, and then less, as the child was not quite so nervous. As she was up and around on Monday, it was thought that she was better. She was put to bed at 11 o'clock A. M.; but when she woke up, two hours later, she was covered with perspiration, and the medicine was discontinued by her mother. She complained of headache. On Tuesday morning, she seemed better, and played with her dolls; but by 9 o'clock A. M., Mrs. Van Sickle became alarmed, and sent for defendant. He promised that "he would be right up"; but, although called at about 9 o'clock A. M., he did not reach the child until 2 o'clock P. M. She

seemed to be quite excited, complained of the headache, but of no other pain.  On the arrival of the doctor, she was all covered with perspiration.

"He said, 'She ain't any worse and I think she is better, don't you', and I said, 'No, she looks quite bad to me', and then he said, 'Well, you can continue the same medicine'.  I asked what for, and said she had no fever, and he said it was to keep the fever from coming back.  I said to my husband in the presence of the doctor, that I didn't see the use of giving her medicine as she hadn't a bit of fever, but he said that the doctor ought to know.  The doctor didn't say anything, but he walked out into the dining room with Mr. Van Sickle, and they sat down there.  Pretty soon I went out and asked him what he thought was the matter with the child, and he said he thought it was typhoid fever.  I said it could not be, she is all perspiration.  And then he said, 'Well you might call it brain fever'; and I said, 'It is not brain fever, for she knows everything'; and then he just laughed and said, 'We might call it small pox'; and I said, 'If you don't know what ails the child, you bring up another doctor and we will hold a consultation and see what ails her'.  I says, 'Get Dr. Dick, or a doctor from Sioux City, or anybody'.  He says, 'You can't very well afford that.  Marjorie isn't very sick and will be up in the morning'.  He told Mr. Van Sickle that I was needlessly alarmed and that the child was not very sick."

The witness further testified that the doctor merely glanced at the child when he came Tuesday, and asked no questions concerning her symptoms, and advised to continue same treatment.  She was given a dose from the large vial every hour until 8 o'clock P. M.  She was worse that night, sleeping little and complaining of a headache and being tired, but had no fever.  The upper part of her body was covered with perspiration and her feet cold, though hot cloths were applied thereto.  On Wednesday morning, she looked bad and complained of a headache; her legs were cold and she was

covered with perspiration, but had no fever. At 10 o'clock
A. M., her voice failed, so that she could not speak above a
whisper. The doctor was then sent for and was again called,
two hours later, but did not come until 2:30 o'clock in the
afternoon. She was then covered with perspiration, though
her temperature was normal. He pretended to test her heart
and lungs, and pronounced her heart action all right and also
her lung action, and declared that the medicine was working
all right and she would be up in the morning. The witness
testified further:

"I asked him what made her perspire and caused her to
be cold, and he said he didn't know. He said she might be
suffering from gastritis, and then said it might be paralysis;
and he took and uncovered her, took off all the covers, and
tried to illustrate to us that she had paralysis"; but, accord-
ing to the witness, did not succeed; and got up and walked
out of the room and returned to the room, when Mrs. Van
Sickle said:

"Can't you do something for the child? She is going to
pass off in a little while if there is not something done; and
then he told me again that his medicine was working all
right and that she would be up in the morning, and with
that he left."

Upon leaving, he took a teaspoonful of medicine from the
larger vial, mixed it in a cup of water and gave her the first
dose, and required a teaspoonful to be given every half hour.
He left at 4:30 P. M., saying that the child was not very sick
and she would be up in the morning, and directed that the
medicine be continued. He left some tablets, directing that
two be dissolved in some water and that a teaspoonful be
given her at 6 o'clock. When he left, her teeth were brown
and her lips parched. Her feet and hands were cold and the
under part of her body wet with perspiration. She died at
20 minutes before 6 o'clock P. M. The testimony of plaintiff
and of his son tended to corroborate that of Mrs. Van Sickle.
The defendant was called as a witness by plaintiff and, not-

withstanding evasive fencing on his part, some information about his treatment of the child was extracted. He knew that the medicine prepared by him was left in two vials with labels thereon, giving directions in his handwriting, but he could not say that labels on the vials shown him were in his handwriting, though he thought the directions those he gave. He continued:

"In the smaller vial I put in bryonia and in the larger bottle gelsiminum and aconite. I would have to figure out how much of each I used. I didn't have anything to measure it with. The proportion of aconite and gelsiminum was about half and half. Q. How much aconite did you put in? A. I don't carry aconite in my case. I don't have any there as aconite. Perhaps that will help you to question. Q. I don't see that helps out much, but how much aconite did you put into this bottle? A. You will have to let me figure it out then. Q. All right, sir, do your figuring. A. I put in between two thirds and a whole drop of aconite and of the gelsiminum in the bottle. Q. Now how much of it was aconite and how much of it was gelsiminum? A. Half and half, about. Q. Well, was the gelsiminum— A. I said gelsiminum,—I should have said tincture, I meant tincture. Q. And about how much aconite was there then? A. About two thirds of a drop of the tincture. Q. That is, tincture of aconite? A. It was—it would have been if it had not been diluted. Q. Then about how much real aconite was there—I don't care what form it was in? A. It was about two thirds of a drop, or the equivalent of about two thirds of a drop of the tincture."

He testified further that the tincture was diluted about half from the crude drug, and that there was about the same amount of gelsiminum. After quibbling for some time about whether he said he put a tincture in the vials, he finally conceded that:

"A. As near as I can tell, I put in about 1-10 of the 2-x dilution of the aconite and about 1-10 of the vial of 2-x dilution of gelsiminum and filled it with alcohol and water, so

that would make—the alcohol and water would be about 1-5 of the whole—the other 2-5—the other, the 2-x dilution of gelsiminum and of aconite.''

More quibbling and then:

''I cannot tell you positively how much water I put in the bottle, or whether I filled it half full or two-thirds full, but I think I am pretty accurate as to the dilution. When I put this mixture or dilution of aconite and gelsiminum into this bottle, I just poured from the larger vial into the smaller without measuring. I never aim to be able to say just exactly how much aconite and how much gelsiminum I placed in the vial. I never kept track of that. I put bryonia and no other medicine into the smaller vial, and I think I diluted that with alcohol and water. I don't think I diluted that so much. I think I filled it half full with the drug and then on top of that I put in some alcohol and water half and half.''

He testified further that he prescribed no other medicine unless he so did in the last afternoon, though he prescribed gelsiminum alone, diluted with alcohol and water, on Tuesday, to be administered in the afternoon in 3 to 6 doses.

''Now, I will ask you again, what was this gelsiminum on Tuesday given for? A. A homeopathic physician never gives medicine for diseases. Q. Now, I wish you would answer the question: what did you give it for? A. We do not give our medicine for,—we give it on the indications. Q. Well, what did you give it on? Just tell us about that? A. On those indications that there was fever and headache and backache, and languid condition. I gave it to help her condition, whatever she may have had, if those indications were present. The gelsiminum and aconite were given on the indications as given for fever, headache, and backache. More acute in the beginning. The symptoms more acute in the beginning than they are later. The bryonia was given on the indication that she had pain, various sorts of pain in her system, and made worse by motion.''

On cross-examination, it appeared that he had engaged

in the practice of medicine 31 years and was 62 years of age, and he proceeded:

"I practice the homeopathic school of medicine.. We are governed by symptoms but do not treat symptoms, and the medicine we give is controlled by the symptoms we find present. We do not diagnose a case as being simply fever, or infantile paralysis, and then give medicine for that; but we get what we call the totality of the symptoms if we can get them. In our school of practice we are not believers in, and do not give strong medicines, that is, large doses."

He explained that, in one vial, gelsiminum and aconite were diluted one part to 999 parts of alcohol and water, and there would be therein less than a drop of medicine.

"The symptoms I found were headache, fever, and backache. The vial Exhibit 'B' contained the dilution of bryonia; that was probably about 1 to 500. It might have been 1 to 200. I carry that in my case 1 to 100, and dilute it as I think best. It was for the pain, worse on motion. That was the main indication in any disease where the pain is worse on motion. The dilution of gelsiminum that I gave on Tuesday was probably about the same as I prescribed on Sunday. It might have been a little stronger. Q. What difference was there in the treatment on Tuesday from what it had been on Sunday? A. Omitting the aconite because that was for the acuteness, meaning that it was new. Aconite is used in fresh cases where they are new. On Tuesday I still gave the gelsiminum in about the same dilution, but may be a trifle stronger. It was given for symptoms of a languid condition, and backache and headache. Aconite is given for excitable conditions, and gelsiminum is used when they are more languid."

On being recalled, the defendant testified in answer to an inquiry as to how much aconite he put in the vial, and was asked:

"Q. Do you mean to say that you prescribed this medicine and fixed it up without knowing how much you diluted it,

or in what form you finally left it to be given? A. I diluted it so it would be about 1-10 strength. Q. That would make it then, about 1-1000 part of that mixture, as you finally left it, would be tincture of aconite? A. Yes. Q. 1-100 part of it would be gelsiminum tinctured with that 2-x dilution or whatever solution you gave it? A. Yes. Q. And 198-1000 of the contents of this bottle would be water? A. Well, I think the large portion was water and the small portion was alcohol. I guessed at that, too. I think I put about 1-10 full of bryonia in the other bottle. That was a 2-x dilution. I may be incorrect about that. I think there was two parts of that. I think the bryonia was stronger. The proportion would be about 1-5 instead of 1-10, and then diluted with alcohol and water.''

On cross-examination, he testified:

''On Sunday I examined the patient and found she had a backache, headache and fever. The first time I took her temperature I found the fever to be between 101 and 102. I examined her again on Tuesday. She had a headache, and mentioned stiffness, a weakening of the right leg; she could not lift the leg herself to separate the legs; she asked her mother to do that; abdomen slightly tender; whitish coated tongue; temperature 100.5. I prescribed that medicine and gave it as a practicing physician.''

### RE-DIRECT EXAMINATION.

''On Tuesday I examined this girl and found that she had a headache and backache and was in a languid condition, and that there was difficulty in moving one of her legs. She didn't appear to be quite a sick girl on that day. These various symptoms did not impress me that she was very ill. They seemed to be a little peculiar but only interested me in that way. The case only interested me because of its peculiarities. Q. The fact that anything serious was the matter

with her did not interest you, or did not attract your attention? A. No, there was no reason to. Q. There was no symptom that you have described that appealed to you as having a serious side to it? A. I took note of the peculiar symptoms but did not think there was any gravity to it. . . . On Wednesday I examined the chest and heart and took her temperature and looked at her tongue and felt of her head; I found that she was slightly flushed; she looked natural; her face was calm; her lips were not brown: I think they were in their natural condition and color, excepting the tongue. She laid on her back and seemed to lay very quiet; I put my hand upon her head and she said she had a headache; she was breathing a little rapidly; her respirations were more rapid than usual. I cannot say exactly what was her respiration, and made no record of that. I should think it might be 35 to the minute. The normal respiration of a child 9 years old is about 18 to 20. I did not say that her respiration was extremely rapid; it was abnormal. I listened to her heart and chest and found that there was no trouble with the lungs or heart, except the rapidity of the respiration. The heart was normal and her lungs were perfectly clear. I don't just now think of what else I did. I don't know her temperature. The normal temperature of a child of that age is 98.6. There was no cold perspiration on her face. I don't know where it was, and I don't think there was any. I didn't notice any cold perspiration on any part of her body before that time. I don't think I examined her lower limbs. Mrs. Van Sickle did not call my attention to the condition of the child's limbs as being cold clear to the feet. I did not examine her limbs or test them to see whether she could move them at that time. It (her increased respiration) was a peculiar thing and I knew it ought to have a reason, and the lungs were clear, but I didn't think it meant anything only that one may commence to breathe fast once in a while on account of some temporary change that causes a little rapid respiration, but I called attention to that, that it was a peculiar symptom. I told

them that it was a symptom that I did not thoroughly understand, and that was the truth. It is the truth that with this symptom, which I did not understand, prevailing, I left the house on that afternoon thinking that it would not be necessary to come back at all. After I left the house on Wednesday afternoon, and before the child died, I did not concern myself about her or make any inquiries over the phone or otherwise. I didn't give any medicine or any treatment for that."

The witness further testified that he had noticed such symptoms before; that the increase of respiration was due to excitement or something of the kind in children; and that, in this instance, it did not impress him; and that he was taken by surprise when the child died; and that nothing led him to believe that she was in a serious condition.

"I think I gave belladonna at that time. I am not sure that I gave it that afternoon. Q. You think you gave her belladonna? A. I think I did, yes. Q. About how many doses of it? A. I caused it to be given—but it is immaterial—oh, I don't know exactly, I don't remember. Q. Didn't you give her a dose very soon after your arrival, and then again each hour until you left? A. Well, I don't know, I may have, I don't know, I don't remember. Q. Do you remember in what form you gave this belladonna? A. That was given the same way as the others, about 3-x, about the same dilution. Q. That would be about 1-1000 part of belladonna and 999 parts of alcohol and water? A. Yes, about."

He testified that she could then talk above a whisper; "that her clothes were lifted, and I examined her abdomen, because I was thinking of typhoid fever, and I examined for other things; while I had given the medicine considering that it was a case of ordinary influenza, but was looking for something else that you—some other reason why she got worse that way after being better. Q. And what did you find? A. I found—I think on both days I found the abdomen slightly tender, as it would be in typhoid fever, and a little sound of gas in the bowels, a little abnormal."

He testified that belladonna is a stimulant to circulation without affecting the heart.

"Q. How can it stimulate the circulation without affecting the heart? A. Because of the strong irritation of the head and spinal cord; it is one of the strongest drugs in that way that we have. Q. What condition did you find on that day that led you to believe— A. We do not give it for a stimulant, understand. Q. What did you give it for? A. It is homeopathic for that case. Q. What were you giving the medicine for? A. I am not giving it to relieve people. Q. What did you give it for, to cure them? A. Yes, sir. Q. Now, Doctor, the medicine that you prescribed for that little girl on Wednesday afternoon was to relieve, or we will say cure, the conditions which you found to exist? A. Yes, sir. Q. And the ailments from which you thought she was suffering? A. To help her, yes, sir. Q. What is the difference between helping and relieving them? A. There is a vast difference. Q. Now, for what particular condition that revealed itself to you on Wednesday afternoon did you give the belladonna? A. Evidence of increased circulation in the brain and probably the upper part of the spinal cord, and severe pain in this region. Belladonna would increase the circulation, the amount of blood that would flow to the head; increase the quantity. I gave the belladonna because it is intended, homeopathically, to decrease the circulation in the head. Q. Is that generally the effect that belladonna has? A. No sir, it is just the opposite. . . . A. It (belladonna) decreases the amount that goes to the feet and legs and increases that which goes to the head."

On re-cross-examination, he testified that there did not appear to be anything alarming in the conditions; that the medicines prescribed were those recognized by his school of medicine in the treatment of cases with conditions as they appeared.

"My feeling that there was nothing serious wrong with her was based upon the fact that I felt that I had correctly

diagnosed her case and had administered to her the proper and necessary medicines; and that she first improved, and then possibly got worse, from either cold or chill, I thought. My feeling that she was recovering and was not seriously ill was founded upon the fact that I had used the best skill I had in homeopathy in administering the medicine to her. I found some evidences of paralysis the last day and the day before. Q. You have been asked to give your opinion as to what in your opinion was the ailment of the child; I will ask you if it is not true that in your best judgment now, that this child died of infantile paralysis? (Objected to as incompetent, immaterial and irrelevant, and not proper cross-examination. Overruled; plaintiff excepts.) A. Most surely yes. I considered it was what is called infantile paralysis.''

### RE-DIRECT EXAMINATION.

''There are no diagnostic symptoms of infantile paralysis until the child is dead. There are no characteristics by which it can be determined before a total paralysis, and if they have a total paralysis they are dead. This child had a total paralysis when it died, I infer. I hadn't seen the child for about two hours before she died. When I last saw her she had some symptoms of paralysis. I discovered one of them on Tuesday, one of them—I think that failure of respiration that I noticed, but didn't interpret that at the time. I didn't interpret that until after she died. I talked to the family about that before she died. I told them she was suffering from what might be gastritis, or might possibly be infantile paralysis. I don't know that she was infected with the germs of infantile paralysis, but it was suggested to my mind. That was just one of the several things that suggested itself to my mind. I was inclined to think it was la grippe or cold, or something like that, that was a common complaint. I see that every day nearly. I didn't test her for paralysis at any time. I was not trying to find out whether she had paralysis.

On Tuesday I noticed something that stayed in my mind as a suggestion, but still I was governed by my general conclusions. I did not think very seriously of the fact that her leg was a little bit paralyzed; it just impressed my mind as a little peculiar. I never tested her. On Wednesday I found out a similar condition, that she could not move her one leg over the other, but her clothes were lifted, and there was talk between the mother and myself, I believe it was the mother; that spoke about the use of the muscles in the upper part of the leg; and some talk upon my part that there might be something impending, that there might be infantile paralysis, although it was not all the muscles of the thigh; but I explained that there might be a single muscle affected and still it might be that disease, but I knew that if it was only a single muscle that it was not that. I did not think she had infantile paralysis.''

Dr. Fettis was called as a witness; and, though practicing as a physician of the allopathic school of medicine, testified as follows, without objection:

''Q. Are you acquainted with the physiological effect of aconite? A. To a certain extent I am. Q. And of gelsiminum? A. That is a drug that I don't think I have ever used. Q. And of bryonia? A. I never use it at all. Q. Do you know something of their general effects, especially diluted to a very great extent? A. To a great extent, no. Q. What would you say as to whether gelsiminum, when reduced to one part of gelsiminum to 999 parts of water, would have any physiological effect upon the human body when given in doses of from 6 to 7 drops? The Court: I think, Mr. Sammis, you ought to ask him whether he knows or not? Q. Doctor, can you tell, and do you know what the physiological effect upon the human body would be of doses of from 4 to 7 drops each, of a preparation composed of aconite diluted to one part of aconite to 999 parts of alcohol and water, and one part of gelsiminum diluted to the same degree, both of which were mixed with alcohol and water, such doses being given at inter-

vals of say, 30 minutes to an hour, or an hour and a half? A. Yes. Q. Now, what would that effect be? A. It would have no physiological effect. Q. You may state, if you know, the physiological effect upon the human body would be from the giving of bryonia diluted to one part bryonia and 500 parts of alcohol and water, principally water, upon the human system, given in doses of from four to six drops at a dose, and those drops mixed with a teaspoonful of water and given every hour or thereabouts; just state if you can tell what its effect would be, first? A. It would have no effect at all. Q. Now, Doctor, basing your answer upon the hypothetical question which was put to you yesterday, and which you were not permitted to answer in the form in which it was then put, I will ask you to state whether or not, in your opinion, the child, Marjorie Van Sickle, was in a condition, on the day of her death and the day prior thereto, when, in giving her ordinarily skillful treatment as practiced by physicians generally, without regard to the school of medicine to which they belong, in Hawarden, and vicinity, in 1911, she should have been given medicine in the form of drugs that would have had some physiological effect on her body? A. The child should have had a drug that would take effect. I know what the recognized symptom of infantile paralysis is. It is paralysis. There is no other recognized symptom of that disease, nor any other symptom by which you can diagnose the trouble as being that disease except paralysis. I have personally treated probably 12 to 15 cases of that character. The paralysis usually appears within a few hours after the outset of the disease. The percentage of mortality is very light. I cannot state more definitely for I have not read up on it to know. I am talking from observation. I have not read up as to the mortality over the country. Headache is not a symptom of infantile paralysis, that aids in diagnosing the disease before the paralysis comes on. The first and only symptom that appears in infantile paralysis that leads one to so diagnose the trouble is the paralysis. That most frequently makes its appearance in the

lower extremities. Usually one lower limb will be paralyzed temporarily, finally, leaving the one set of muscles permanently paralyzed. Increased respiration, headache and backache, and complaint on the part of the patient that pressure on the head hurts her, are not symptoms of infantile paralysis in the absence of the paralysis itself.''

Nothing short of setting out this evidence in detail could well illustrate the manner of defendant's diagnosis of the condition and symptoms of this child, the dilatoriness with which he attended her when summoned to her bedside, his peculiar method of preparing the medicine to be administered, and his utter lack of appreciation of his obligation to his patient, when in sore need of relief. The jury might well have found that after Tuesday morning her ailment was serious, and yet that defendant gave her scant examination and apparently was unable to say whether she was afflicted with typhoid fever, brain fever, small pox, gastritis, influenza, or paralysis. He might then have been found to have been negligent in diagnosing her condition or symptoms and therefrom ascertaining her ailment. Not attending the child for several hours after undertaking to do so when summoned, in view of her condition, might well have been found to have been negligence on his part. No explanation of his dilatory conduct was attempted. Though apparently without knowledge of the particular disease from which the child was suffering, he in effect refused to allow another physician to be called in consultation. His testimony leaves much uncertainty as to the quantity and quality of any remedy administered and whether it was appropriate to the symptoms manifested; and the jury might have found this to have been in such infinitesimal quantities as to have had no physiological effect on her system; that he continued the administration of the same medicines notwithstanding the fact that she was growing worse instead of improving from taking them; and that she died of an ailment in which the mortality is very light; and that, had she been given appropriate treatment and careful

attendance, she probably would have recovered. No one can read this record without being convinced that defendant was utterly ignorant of the ailment of which she was suffering, until after her death; that he did not exercise reasonable care in ascertaining the same; and that, in prescribing medicines, he exercised neither the care nor skill exacted of such a practitioner. We have little difficulty in finding that the evidence was such as to carry to the jury the issues as to defendant's negligence on the first three grounds alleged. Our only difficulty is in determining whether death might have been found to have been in consequence of such negligence. This is always a question of probability in such cases; for no one can say absolutely whether a patient, even though properly treated, would have survived. The inquiry necessarily is whether recovery would have been more likely in that event, and a cure in all reasonable probability have been effected. The child had enjoyed good health previously. She might have been found to have been suffering from an ailment which would have given way readily to proper treatment, had such treatment been accorded her, and, from these and other facts, the conclusion might have been reached that, but for defendant's negligence, she would have recovered. The cause should have gone to the jury.—*Reversed.*

DEEMER, GAYNOR and SALINGER, JJ., concur.