James R. SPEED, Appellee,

v.

STATE of Iowa, Appellant.

No. 2–57672.

Supreme Court of Iowa.

April 14, 1976.

Richard C. Turner, Atty. Gen., John E. Beamer, Asst. Atty. Gen., and Arthur O. Leff, Iowa City, for appellant.

Meardon, Sueppel, Downer & Hayes, Iowa City, for appellee.

Heard by MOORE, C. J., and UHLEN-HOPP, REYNOLDSON, HARRIS and McCORMICK, JJ.

UHLENHOPP, Justice:

In this appeal in a medical malpractice case, the State of Iowa challenges the sufficiency of the evidence to generate fact questions on negligence and proximate cause and the propriety of expert testimony.

In the fall of 1970, plaintiff James R. Speed attended The University of Iowa, where he was a member of the University's varsity basketball squad. About November 1 of that year he developed an upper respiratory infection—a cold—which persisted through the month; the basketball trainers

gave him cold tablets. On Thanksgiving Day, November 26, he had a toothache and a headache. The next day, Friday, he went to the Oral Surgery Department at University Hospitals, where Edward L. Lorson, an oral surgeon, saw him. Dr. Lorson, finding two of Speed's teeth to be seriously decayed, extracted them. The extractions were uncomplicated. Dr. Lorson prescribed codeine and aspirin for pain.

Plaintiff's headache nevertheless became worse Friday night, accompanied by nausea. On Saturday he returned to Oral Surgery, where Dr. James G. Beurle found the tooth extraction sites to be healing properly. Dr. Beurle intravenously administered the analgesic Demerol for pain, and gave plaintiff Phenergan intravenously for nausea. He prescribed capsules of the analgesic Dilaudid, to be taken by plaintiff when the Demerol began to wear off.

Plaintiff's headache persisted through the weekend. His whole body ached, he could not eat, and he had other symptoms of illness.

On Monday morning, November 30, a friend took plaintiff back to Oral Surgery. Dr. Beurle again examined the extraction sites and found them healing normally. He could not explain plaintiff's pain. He prescribed placebos without, of course, telling plaintiff they were such—he had one of the basketball trainers give plaintiff vitamin pills.

After returning to his apartment, plaintiff went to bed and tried to sleep. In the middle of the afternoon another basketball trainer, apparently at the direction of the basketball coach, came to plaintiff's apartment. He took plaintiff to the University Student Health Infirmary, where the team physician, W. D. Paul, examined plaintiff. While taking the history and examining, Dr. Paul became aware of plaintiff's cold, headache, nausea, loss of appetite, dehydration, dizziness, lethargy, inflamed eyelids, and general malaise. Dr. Paul testified he did not reach a definite diagnosis at that time, but considered the possibilities of infectious mononucleosis, brain abscess, and septicemia (invasion of the bloodstream by virulent microorganisms from a local seat of infection). He had plaintiff put to bed in the Infirmary, leaving instructions that plaintiff be given fluids and Bufferin. He did not order laboratory tests.

Shortly after Dr. Paul examined him, plaintiff experienced expulsive, projectile vomiting. Dr. Paul was not told of this. Dr. Robert G. German, whom Dr. Paul had asked to examine plaintiff, was aware of the vomiting. At about 5:00 p. m. Dr. German examined plaintiff and observed soft palate petechiae (small red spots on the soft palate) and redness of the lids of both eyes. He directed that Phenergan be given for plaintiff's nausea and that a complete blood count, urinalysis, and mononucleosis spot test be done the next morning.

Plaintiff's temperature went up and down Monday night, ranging from 104.4 to 101.8 degrees. By 11:00 p. m. his eyelids had swollen until his eyes were only slits. The nurse on duty at the Infirmary telephoned Eduard Sujansky, the doctor on call that evening. After being told of the situation, Dr. Sujansky prescribed Seconal and referral to Oral Surgery in the morning.

The nurse remained concerned. Throughout the early hours of Tuesday, December 1, she checked plaintiff several times to see whether he could touch his chin to his chest without difficulty. At about 5:30 a. m. Speed could not carry out the chin-to-chest test without experiencing stiffness and pain, which is a recognized symptom of meningitis. The nurse again telephoned Dr. Sujansky, who immediately came to the Infirmary and examined plaintiff. By this time one of plaintiff's eyes was beginning to bulge out of its socket, a condition called proptosis. At Dr. Sujansky's request, a resident from the Neurology Department at University Hospitals examined plaintiff.

Plaintiff was then taken to the Neurology Department, where he was given the anticoagulant Heparin and massive doses of the antibiotic Ampicillin. The proptosis increased, extending to both eyes.

On Tuesday afternoon, surgeons at the Hospital operated on plaintiff and removed

his ethmoid sinuses. During the next days plaintiff received intensive medical care. The physicians and surgeons saved his life but not his sight; he emerged permanently blind.

The doctors who treated plaintiff in the Neurology Department ultimately concluded that cavernous sinus thrombosis caused the blindness. An infection, probably originating in the ethmoid sinuses, traveled back into plaintiff's cranium and caused blood clotting—thrombosis—in the veins passing through an area in the center of the head called the cavernous sinus. These veins include those going to the eyes. Blockage of these veins resulted in the stoppage of the arterial flow of blood to the eyes, which in turn caused the retinae in the eyes to die.

Plaintiff sued the State of Iowa under the Tort Claims Act, chapter 25A, Code 1973. He did not complain about the care he received in the Neurology Department after Tuesday morning. He did claim, however, that Drs. Lorson, Beurle, Paul, German, and Sujansky negligently cared for him and that their negligence cost him his sight. The parties tried the action to the trial court by ordinary proceedings. Code 1973, § 25A.4. The court found Dr. Beurle negligent in failing to obtain assistance from doctors in other areas of practice, and that this negligence was a proximate cause of plaintiff's blindness. The court also found that Dr. Paul was negligent in failing to employ appropriate tests and examinations and that this negligence too proximately caused the blindness. The court awarded plaintiff damages, and the State appealed.

The State contends before us that the record contains insufficient evidence to support the trial court's findings of negligence and proximate cause. The State also contends that plaintiff's experts were not competent to render opinions and that one of them based his opinion on facts not disclosed to the trial court. Finally, the State contends that the hypothetical question put by plaintiff to his experts was improper in several respects. The State does not raise issues before us regarding damages or regarding its responsibility under the respondeat superior doctrine for the conduct of the doctors.

■ I. *Sufficiency of Evidence of Negligence and Proximate Cause.* A physician is liable for injury to a patient caused by failure of the physician to apply that degree of skill, care, and learning ordinarily possessed and exercised by other physicians in similar circumstances. *Perin v. Hayne*, 210 N.W.2d 609, 615 (Iowa). Ordinarily, questions of negligence and proximate cause are for the trier of fact, here, the trial court. Rule 344(f)(10), Rules of Civil Procedure. If supported by substantial evidence, the findings of a trier of fact on negligence and proximate cause are binding on us. Rule 344(f)(1). We view the evidence in the light most favorable to the judgment. Rule 344(f)(2).

A. *Negligence.* We need not go beyond the evidence regarding Dr. Paul's conduct. The trial court found that doctor negligent "in that he failed to employ recognized and appropriate tests or examinations to gather the information necessary to prescribe a proper course of treatment of Plaintiff's condition . . . ." Our examination of the record discloses that the evidence amply supports this finding.

Plaintiff presented Orion H. Stuteville as a witness, who is a doctor of both dentistry and medicine with impressive credentials. Dr. Stuteville testified that in his opinion Dr. Paul did not use ordinary care and skill in his treatment of plaintiff. Plaintiff's second expert is a medical doctor, Douglass S. Thompson. Dr. Thompson also testified that Dr. Paul did not exercise proper care and skill under the circumstances, saying specifically that on Monday Dr. Paul should have done an immediate spinal tap, a complete blood count, a urinalysis, and a mononucleosis spot test. The third expert plaintiff called, Edward B. Rotheram, a medical doctor testified similarly that in his opinion Dr. Paul and the other doctors involved did not fulfill ordinary medical standards of care with respect to plaintiff and specifically that Dr. Paul should have given plaintiff

a more thorough physical examination and a spinal tap.

In addition, several of the witnesses called by the State gave testimony from which the trial court could infer negligence on the part of Dr. Paul in taking no further action after considering brain abscess and septicemia. Dr. Robert Hardin, Vice President for Health Affairs at The University of Iowa, testified that if he had an impression of septicemia, he would do an immediate blood culture and if he had an impression of brain abscess, he would order X-rays and a spinal tap. Dr. Sujansky, one of the doctors who treated plaintiff, testified that if he had an impression of brain abscess, he would arrange for a brain scan. Dr. Adolph Sahs, a witness for the State and head of the Department of Neurology at University Hospitals, testified that if he had an impression of brain abscess, he would do a spinal tap and a brain scan "as quickly as possible."

■ The State urges several contentions. It first invites our attention to testimony contrary to the evidence for plaintiff. Drs. Paul and German testified that no further tests were indicated on Monday afternoon. Dr. Charles McCallum, Professor of Dentistry and Oral Surgery at the University of Alabama Medical Center, testified that Dr. Paul's treatment of plaintiff was proper. Another State's witness, Dr. John Wilde, said that under the circumstances a spinal tap or complete blood count was not indicated on Monday afternoon. This evidence, however, does not nullify plaintiff's evidence. It was evidence for the trier of fact to weigh and consider, but our function is only to determine whether the record contains substantial evidence in support of the trial court's finding. *Grefe v. Ross*, 231 N.W.2d 863 (Iowa); *Frantz v. Knights of Columbus*, 205 N.W.2d 705 (Iowa).

■ The State also argues that Dr. Paul should not be held liable for failure to diagnose cavernous sinus thrombosis on Monday afternoon, since the evidence indicates that a doctor of ordinary skill could not have done so. The trial court found Dr. Paul negligent, however, not because he failed to diagnose cavernous sinus thrombosis specifically, but because he failed to conduct appropriate tests and examinations.

The State contends further that Dr. Paul merely made an honest mistake in judgment for which he should not be held negligent, citing *Sinkey v. Surgical Associates*, 186 N.W.2d 658 (Iowa), and *Cozine v. Moore*, 159 Iowa 472, 141 N.W. 424. In *Sinkey* we said, "The record here discloses an honest mistake in the doctor's judgment, but does not show he was negligent in arriving at his opinion." 186 N.W.2d at 662. The record in that case, however, contained no expert testimony the doctor was negligent in his decision on how to proceed, whereas the record before us contains considerable expert testimony to that effect. In *Cozine,* similarly, the experts did not testify that the doctor acted negligently; they said only that they might have followed a different course. 159 Iowa at 478, 141 N.W. at 427. Here, however, plaintiff's evidence goes farther than a judgmental selection of one of two alternatives either of which would have been chosen by a medical practitioner of ordinary skill.

We conclude that plaintiff adduced substantial proof of negligence on the part of Dr. Paul.

■ B. Proximate Cause. We also conclude plaintiff introduced substantial evidence that Dr. Paul's failure to conduct appropriate examinations and tests was a proximate cause of plaintiff's blindness. Plaintiff must show that Dr. Paul's negligence was a substantial factor in bringing about the blindness; otherwise the negligence would not create liability. Restatement, Torts 2d §§ 430, 431. Plaintiff's case is considerably closer on causation than on negligence, but we think plaintiff generated a fact issue.

■ As to the first link in the causation chain, the trial court could reasonably find from the evidence that proper examinations and tests Monday afternoon would probably have revealed a high white blood cell count and a cloudy spinal fluid indicating intracranial infection.

As the second link the trial court could reasonably find from the testimony of Drs. Thompson and Rotheram that such test results would probably have led to prompt administration of large doses of antibiotics. Even Dr. Sahs, a State's witness, testified that he would do a spinal tap if he had an impression of a brain abscess and that if the results were positive he would start antibiotic treatment as quickly as possible.

At this juncture the State refers to testimony by some of its witnesses distinguishing the "old school" on the indiscriminate use of antibiotics from the "modern school" which ordinarily withholds use of antibiotics until tests reveal the precise one to use. The State's argument appears to be that even if proper tests and examinations had been made, the Hospital doctors would probably have waited until at least the next day for the results of blood cultures before administering antibiotics, that they did administer antibiotics the next day, and that failure to conduct tests and examinations therefore did plaintiff no harm.

The conflict between plaintiff's experts and the State's experts on the old and modern schools is more apparent than real. The evidence indicates that when a situation is urgent, when a patient's condition does not permit further delay, physicians employ broad-spectrum antibiotics without waiting for blood cultures. The trial court could reasonably find from the evidence that such would probably have been done here on Monday afternoon, had appropriate examinations and tests been made at that time.

As the final link in the causation chain, plaintiff introduced substantial evidence supporting the trial court's finding that antibiotics given Monday afternoon probably would have prevented the blindness. Dr. Stuteville testified he would have administered antibiotics Monday afternoon and plaintiff's sight still could have been saved at that time. Dr. Rotheram indicated that if plaintiff had been given penicillin, the blood clot in the cavernous sinus would have dissolved. Drs. Stuteville, Thompson, and Rotherham all testified generally to a probable causal connection between the course of conduct pursued by Dr. Paul and plaintiff's blindness.

In this connection, the State points to testimony by Dr. Rotheram which it contends shows that prevention of plaintiff's blindness by earlier treatment was only a possibility. Dr. Rotheram testified that since the advent of penicillin, "Even the more pessimistic [studies] would estimate that 50 percent of the patients [developing cavernous sinus thrombosis] now survive, and that includes the patients who were never treated but discovered at autopsy . . . . [B]lindness or partial loss of vision in one or both eyes . . . might be present [in] about one-fifth of the survivors." The State concludes Dr. Rotheram thus admitted that only a 40% chance of preventing plaintiff's blindness existed on Monday afternoon, which is not a probability.

The State's conclusion does not follow from Dr. Rotheram's testimony. The figures cited by Dr. Rotheram include patients who were never treated, while plaintiff was treated. Dr. Rotheram did not give statistics for treated patients as a group. Also, Dr. Rotheram said that the quoted figures were from the more pessimistic studies. We do not believe his statement indicates that only a 40% chance of saving plaintiff's sight existed on Monday afternoon. But even if it did, this was evidence favorable to the State which would not nullify, for present purposes, the evidence favorable to plaintiff.

Plaintiff's case on causation thus involves several steps: proper examination and tests would probably have disclosed intracranial infection, the disclosure would probably have led to prompt administration of large doses of antibiotics, and the antibiotics probably would have prevented blindness. Plaintiff introduced expert testimony in support of these steps. Certainly the factfinder could have refused to take one or more of the steps, but it took them.

Plaintiff's causation theory is not unique in thus involving several steps. In medical malpractice cases involving failure to exam-

ine or diagnose properly, the plaintiff ordinarily claims that several steps followed the failure: probable results which testing would have disclosed, probable treatment accordingly, and probable success of the treatment. *Harvey v. Silber*, 300 Mich. 510, 520, 2 N.W.2d 483, 487 ("[T]he jury could properly infer that [the defendant] would have operated if he had known the true position of the bullet. The negligent diagnosis then was the proximate cause of the failure to operate. There is testimony in the record that there was a probability that an operation would have saved [the patient's] life. Therefore the negligent diagnosis could be said to have been the proximate cause of the death."). Courts applied a rationale similar to that in *Harvey v. Silber* in *Burford v. Baker*, 53 Cal.App.2d 301, 127 P.2d 941; *James v. Grigsby*, 114 Kan. 627, 220 P. 267; and *Merker v. Wood*, 307 Ky. 331, 337, 210 S.W.2d 946, 949 (if proper X-rays had been taken, proper treatment would have been given, and the treatment would have prevented the injury). See also *Wilson v. Corbin*, 241 Iowa 593, 603, 41 N.W.2d 702, 707 ("there is substantial testimony . . . that plaintiff's condition is permanently worse than it probably would have been if the injury had been promptly diagnosed and treated"); *Van Sickle v. Doolittle*, 173 Iowa 727, 744, 155 N.W. 1007, 1012 ("This is always a question of probability in such cases, for no one can say absolutely whether a patient, even though properly treated, would have survived. The inquiry necessarily is whether recovery would have been the more likely in that event and a cure in all reasonable probability have been effected.").

On the evidence before us, reasonable minds would differ on whether to take the causation steps. Plaintiff therefore generated a fact issue, and the trial court's finding on causation stands.

II. *Plaintiff's Experts.* The State contends that plaintiff's experts were not competent to answer the hypothetical question propounded to them and that one of them assumed facts in addition to those hypothesized.

A. Competency. Plaintiff's counsel asked each of plaintiff's expert witnesses a lengthy hypothetical question. On each occasion, the State objected on the ground among others that the experts were not qualified to render an opinion because they did not have sufficient knowledge of the standard of care applicable to physicians in the Iowa City community.

This issue initially confronts us with a dispute as to whether the "locality rule" applies in medical malpractice in Iowa. This court incorporated the locality rule in a general statement of the legal standard of medical care in *Sinkey v. Surgical Associates*, 186 N.W.2d 658, 660 (Iowa):

> A patient is entitled to a thorough and careful examination such as his condition and attending circumstances will permit, with such diligence and methods of diagnosis as are usually approved and practiced by physicians of ordinary skill and learning under like circumstances *and in like localities.* (Italics added.)

Under this rule, the standard of care practiced in like localities places a qualification upon the care and skill required of a physician. 70 C.J.S. Physicians & Surgeons § 43 at 950.

Commentators have severely criticized the locality rule under modern conditions of medical education and practice. See Waltz, The Rise and Gradual Fall of the Locality Rule in Medical Malpractice Litigation, 18 DePaul L.Rev. 408; Note, An Evaluation of Changes in the Medical Standard of Care, 23 Vanderbilt L.Rev. 729, 733; Comment, 18 DePaul L.Rev. 328. The trend in other jurisdictions is toward abandonment of the rule. *Gambill v. Stroud*, 531 S.W.2d 945 (Ark.); *Blair v. Eblen*, 461 S.W.2d 370 (Ky.); *Josselyn v. Dearborn*, 143 Me. 328, 62 A.2d 174; *Brune v. Belinkoff*, 354 Mass. 102, 235 N.E.2d 793; *Silberstein v. Berwald*, 460 S.W.2d 707 (Mo.); *Naccarato v. Grob*, 384 Mich. 248, 180 N.W.2d 788; *Germann v. Matriss*, 55 N.J. 193, 260 A.2d 825; *Douglas v. Bussabarger*, 73 Wash.2d 476, 438 P.2d 829; *Shier v. Freedman*, 58 Wis.2d 269, 206 N.W.2d 166, mod. on other grounds, 208 N.W.2d 328.

Our own cases indicate disapproval of the locality rule. This court rejected the rule insofar as negligence of hospitals is concerned. *Dickinson v. Mailliard*, 175 N.W.2d 588, 596–597 (Iowa). The court said, "[T]he correct standard of care to which hospitals should be held is that which obtains in hospitals generally under similar circumstances. In deciding what are 'similar circumstances,' the jury may consider the customs and practices followed in the particular community and like communities as one element, but these are not conclusive." We also rejected the locality rule in veterinary malpractice. *Ruden v. Hansen*, 206 N.W.2d 713, 715–716 (Iowa). A number of our cases hold the locality rule inapplicable where the physician is a specialist. *Perin v. Hayne*, 210 N.W.2d 609, 615 (Iowa); *Grosjean v. Spencer*, 258 Iowa 685, 691, 140 N.W.2d 139, 143; *Barnes v. Bovenmyer*, 255 Iowa 220, 228, 122 N.W.2d 312, 316. Also, after noting this state's previous adherence to the locality rule, this court stated in 1950:

> There seems to be sound basis for holding a physician to such reasonable care and skill as is exercised by the ordinary physician of good standing under like circumstances. And the locality in question is merely one circumstance, not an absolute limit upon the skill required. *McGulpin v. Bessmer*, 241 Iowa 1119, 1131, 43 N.W.2d 121, 128.

Because the plaintiff's expert in *McGulpin* was competent even under the locality rule, the court did not expressly abrogate that rule in Iowa. Yet the position taken by the court was so clear that the case was cited in *Dickinson v. Mailliard* for the proposition, "[W]e have long compelled [doctors] to abide by the rules of good practice followed generally under similar circumstances." 175 N.W.2d at 596.

■ We thus conclude that the statement of a physician's duty found in *Sinkey v. Surgical Associates*, insofar as it assumes the locality rule is the law in Iowa, is not in step with the trend of our decisions, while the statement from McGulpin reflects the view of this court.

Under the record before us, however, we must still consider the locality rule. The hypothetical question which plaintiff put to his experts asked whether the doctors who treated plaintiff applied to his case the degree of knowledge, skill, care, and attention ordinarily possessed and exercised by such practitioners "under like circumstances *and in like localities* during November and December, 1970." (Italics added.) The issue is whether plaintiff's experts were qualified to answer that question, for this court stated in *Tiemeyer v. McIntosh*, 176 N.W.2d 819, 824 (Iowa), "[I]t is not enough that a witness be *generally* qualified in a certain area; he must also be qualified to answer the particular question propounded." See also *Ruden v. Hansen*, supra, 206 N.W.2d at 717; *Ganrud v. Smith*, 206 N.W.2d 311, 314 (Iowa). Perhaps because of the Sinkey statement, plaintiff thus injected the locality rule into the case by the form of his hypothetical question. Were plaintiff's experts knowledgeable about the standard of medical care in places like University Hospitals?

■ In determining whether the trial court erred in allowing plaintiff's experts to answer the hypothetical question, we recognize that the receipt of opinion evidence, lay or expert, rests largely within the discretion of the trial courts and that we will not reverse unless manifest abuse of discretion appears. *Porter v. Iowa Power & Light Co.*, 217 N.W.2d 221, 231 (Iowa); *Ganrud v. Smith*, supra, 206 N.W.2d at 314.

■ The record discloses that plaintiff's experts were sufficiently knowledgeable about medical standards in places like University Hospitals to be allowed to voice their views. We agree with this statement by Waltz, supra, 18 DePaul L.Rev. at 415:

> [I]n determining similarity the courts will not now look to such socio-economic facts as population, type of economy, and income level but to factors more directly relating to the practice of medicine. In the main, an expert practicing in a locality having medical facilities comparable to those existing in the defendant's community is permitted to testify concerning the

standard of care governing the defendant.

The State's doctors who attended plaintiff practiced in The University of Iowa medical complex. The University of Iowa Hospital is a teaching hospital, affiliated with The University of Iowa College of Medicine. The testimony at trial showed that medical practice at The University of Iowa reflects as high degree of knowledge, skill, care, and attention as that at other university medical centers.

Plaintiff's first expert, Dr. Stuteville, received training as both a dentist and a medical doctor. As a graduate student, he taught at Northwestern University's dental school. From 1951 to 1970 he was chairman of the Oral Surgery Department at Northwestern and a lecturer on plastic surgery at Northwestern's medical school. At time of trial, he was chairman of the Departments of Plastic Surgery at Loyola University Hospital, St. Joseph Hospital, and Veterans Administration Hines Hospital, all in Chicago. He testified that the hospitals at Northwestern and Loyola are similar to those found in other university medical centers in the Midwest.

Dr. Thompson received his training at Boston University School of Medicine. He practiced at Bellevue and University Hospitals in New York City, both of which are affiliated with New York University Medical School. He taught medical students at New York University Medical Center and was director of student health services at New York University from 1956 to 1960 and at the University of Pittsburgh from 1960 to 1969. At time of trial he practiced at the University of Pittsburgh's Presbyterian Hospital and at Magee-Women's Hospital. All of these hospitals are large, and all are teaching hospitals associated with medical schools.

From 1964 to 1968, Dr. Rotheram was on the faculty of the Pittsburgh School of Medicine. At time of trial he was head of the Department of Infectious Diseases at Allegheny General Hospital, which is affiliated with the medical school at the University of Pittsburgh. He teaches interns and residents from the University of Pittsburgh as part of his duties at Allegheny General.

We believe that plaintiff's experts were all sufficiently familiar with the standard of care in medical centers like that of The University of Iowa to qualify them to answer plaintiff's hypothetical question. At least, we are unwilling to hold that the trial court abused its discretion in permitting the experts to answer the question.

B. Basis of Expert's Opinion. At one point in the cross-examination of Dr. Stuteville, the following exchange occurred:

Q. [State's Counsel] Now in connection with the answers which you have given and the opinion which you have rendered, did you take into consideration any information which was contained within those depositions [of the doctors and nurses who treated plaintiff]? A. [Dr. Stuteville] Yes.

Q. Did you take into consideration any information which was contained within those depositions which were not contained in the hypothetical question? A. No, I don't think so.

Q. Now are you stating that everything which was in those depositions and everything considered by you was contained in this hypothetical question? A. Everything I took into consideration.

Q. In arriving at your decision did you consider matters which were contained in the depositions, not included in the hypothetical question? A. I'm not—that I'm not sure about.

Q. Doctor, in answering the questions which you have answered here today and in giving the opinions which you have given here today, did you take into consideration, first of all, matters which were contained within these depositions? A. Yes, I think I did.

Q. All right. And in giving your answers and in giving your opinions that you have given here today, did you take into consideration matters shown in those depositions which were not included in the hypothetical question asked of you? A. I'm not sure whether I have or not, no.

Q. Is it possible? A. It's possible.

Q. At this time we have no further questions, but the defendant moves to strike the entire testimony of this witness by reason of the fact that the record now appears that this witness has taken into consideration matters outside the record in giving the answers to the questions propounded to him and in the opinions stated by him in reference to the present proceeding. . . . I would like to expand the objection to specifically relate, of course, to the answers given to the hypothetical question and not the matters as to general knowledge.

The Court: I will reserve ruling on this.

On redirect examination of Dr. Stuteville, the following exchange occurred:

Q. [Plaintiff's Counsel] Doctor, other than the knowledge from your background and experience and practice, teaching experience, are all the answers, your answers to the question today, based upon the assumed facts in the hypothetical before you, Plaintiff's Exhibit 31? A. The answer as I answered the hypothetical question, as it was given, I thought my answer was given from material in this document here.

Q. And now are you referring to Plaintiff's Exhibit 31; isn't that right? A. Yes, whatever this is. Now, I—some of the other questions what was asked that I answered, I answered from my own background knowledge and not from this document.

On further cross-examination by State's Counsel, Dr. Stuteville stated:

Now, when I answered—when you [State's Counsel] asked your question, as I got it, was that did I take into consideration any of the other things in answering the question that you had asked me. I don't know whether I took in any things in the other—in the depositions of the other people in answering some of the questions that you asked me as we went along. But as far as putting the—my opinions about what went on, all of the—I think all of the key things that I

considered are in—was answered from these various things that was in this document . . . Exhibit 31.

The trial court then overruled the State's motion to strike Dr. Stuteville's testimony. The State claims the trial court erred.

■ We first consider the State's motion as it related to striking Dr. Stuteville's answer to plaintiff's hypothetical question. An expert's opinion should not be admitted when the expert bases his opinion partially on facts not disclosed to the trier of fact. *Albrecht v. Rausch Trucking Co.*, 193. N.W.2d 492, 495 (Iowa); *Lovely v. Ewing*, 183 N.W.2d 682, 685 (Iowa); *Bernal v. Bernhardt*, 180 N.W.2d 437, 441 (Iowa); *Dougherty v. Boyken*, 261 Iowa 602, 614, 155 N.W.2d 488, 495; *Switzer v. Baker*, 178 Iowa 1063, 1077, 160 N.W. 372, 377.

■ We cannot say, however, that the trial court abused its discretion by refusing to strike Dr. Stuteville's answer to plaintiff's hypothetical question. From the quoted testimony, the trial court could reasonably conclude that Dr. Stuteville only considered the hypothesized facts in answering that question.

■ We next consider the State's motion to strike as it relates to Dr. Stuteville's answers to questions by the State—if the motion does so relate. The first problem is that the State's motion appears too narrow for this contention; it seems to relate only to the answers given to plaintiff's hypothetical question. But even if we take the motion to relate to answers to the State's questions, Dr. Stuteville merely said he was unsure whether he considered facts not stated in the hypothetical questions in answering the questions of State's counsel; he may only have meant that some of the facts assumed by State's counsel in various questions were found in the depositions but not in the hypothetical question. We find no abuse of the trial court's discretion here.

III. *The Hypothetical Question.* The State argues before us three objections it lodged against the hypothetical question itself which plaintiff's counsel propounded.

A. **Ultimate Question.** The State asserts that the hypothetical question invaded the province of the trial court by asking the ultimate question which the trial court had to decide—whether the doctors who saw plaintiff applied to his case the degree of knowledge, skill, care, and attention ordinarily possessed and exercised by medical practitioners under like circumstances. But our cases and other authority clearly show that an opinion is not improper merely because it goes to the "ultimate question." *Winter v. Honeggers' & Co., Inc.*, 215 N.W.2d 316, 321 (Iowa); *Olson v. Katz*, 201 N.W.2d 478, 482 (Iowa); *Grismore v. Consolidated Products Co.*, 232 Iowa 328, 344, 5 N.W.2d 646, 655; Fed.R.Evid. 704; 2 Jones, Evidence (6th Ed.) § 14:28 at 660; 31 Am.Jur.2d Expert and Opinion Evidence § 22 at 519. Plaintiff's counsel did not ask the experts what the decision in the case should be or whether the doctors who saw plaintiff were "negligent."

B. **Facts Outside of Record.** The State points out the hypothetical question included as one of its assumed facts that during the night of Friday, November 27, plaintiff's headache became more severe and that "it was like a man in his head beating with a hammer." The State asserts that the record contains no evidence plaintiff told any of the doctors who treated him his headache was throbbing or beating and that the doctors cannot be held negligent for failure to act on the basis of a fact never revealed to them. Hence, the State concludes, the question should not have included any reference to the throbbing nature of plaintiff's headache.

We cannot agree. The hypothetical question did not assume that plaintiff told any doctor about the throbbing; it only assumed his headache *was* of that type. Indeed, part of plaintiff's complaint is that the State's doctors inadequately examined to ascertain the situation. Plaintiff testified that his head ached Friday night "like somebody was standing over me with a hammer, hitting me in my head." The record contains sufficient support for the fact assumed in the hypothetical question.

C. **Failure to Include Material Fact.** The State also objected to the failure of the hypothetical question to include among its assumptions that plaintiff was afebrile (without elevated temperature) when he visited Oral Surgery on Friday, Saturday, and Monday.

First, the hypothetical question does not appear vulnerable to this charge. The question included a note made by Dr. Beurle after plaintiff's Monday visit that plaintiff was afebrile. In addition, the question included Dr. Lorson's clinical notes for plaintiff's Friday visit to Oral Surgery. The notes had a heading "Clinical Exam" but the space under the heading contained no mention of elevated temperature—implying to a reader the absence of such temperature.

But if as the State claims the hypothetical question failed to show that plaintiff was afebrile before he went to the Infirmary Monday afternoon, we could not say the trial court abused its discretion by allowing the experts to answer the question. A hypothetical question need not contain all facts shown in evidence. *Rasmussen v. Thilges*, 174 N.W.2d 384, 388 (Iowa); *Poweshiek County National Bank v. Nationwide Mut. Ins. Co.*, 261 Iowa 844, 854, 156 N.W.2d 671, 676. The question set forth in detail numerous clinical symptoms at the various relevant times; we doubt the failure to state the lack of another symptom misled the experts to whom the question was addressed. We hold that the trial court properly overruled the State's objection to plaintiff's hypothetical question.

We do not find merit in the State's contentions.

AFFIRMED.